## Richmond.

SCHLEY FINNEY v. COMMONWEALTH.

March 20, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Elmer W. Somers, J. Harry Rew* and *J. Brooks Mapp,* for the plaintiff in error.

*John R. Saunders, Attorney General,* and *Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys General,* for the Commonwealth.

Epes, J., delivered the opinion of the court.

Schley Finney was indicted and tried on the charge of having on November 3, 1928, raped Mrs. Mabel Gordy, a young married woman, in the town of Parksley, in Accomac county, Virginia. The accused plead "not guilty." The jury were unable to agree upon a verdict on the afternoon upon which the case was submitted to it, were adjourned over until the following day, and some time during the following day returned the following verdict:

"We, the jury, find the defendant guilty of assault with intent to commit rape, and ascertain the term of his imprisonment in the Penitentiary to be three years." The court overruled a motion to set the verdict aside as contrary to the law and evidence, and entered judgment thereon.

The only assignment of error made is that the accused was prejudiced by a statement made by the trial judge in the presence of the jury while Miss Sallie Causey, a witness introduced by the accused, was testifying. In order to comprehend the full force of this single assignment of error, it is necessary to set out more of the sordid testimony of this case than it is pleasant to do; and even then it cannot be so well portrayed as it is by a reading of the transcript of the testimony of the witnesses, including the interjections from time to time by the trial judge during the examination of witnesses.

The alleged rape is claimed to have taken place in the bedroom of the apartment on the second floor of the home of Mrs. Margaret Causey, in Parksley, which was then, and for some three years before had been, occupied by Mrs. Mabel Gordy and her husband. The only other occupants of the house were Mrs.

Margaret Causey and her daughter, Miss Sallie Causey. The floor plan of the second floor is shown by the below diagram:

Miss Sallie Causey occupied the large bedroom at the head of the stairs. The remainder of the second floor composed the apartment of Mrs. Gordy.

The alleged rape occurred about 6:30 o'clock on Saturday evening, November 3, 1928. At that time Mrs. Margaret Causey, who is an old lady seventy-eight years old and somewhat deaf, was on the first floor of the house; but Miss Sallie Causey, who runs

a millinery shop, was not at home, and did not return home from her shop until about ten or eleven o'clock that night.

The accused and the prosecutrix had come to know each other several years prior to the time either of them married, and for a while had gone together. In October, 1924, the accused married a first cousin of the prosecutrix, and in October, 1925, the prosecutrix married. Both couples lived in Parksley and visited in the homes of each other with intimacy.

Both Mr. and Mrs. Gordy worked. Mrs. Gordy was then and had been for about two years employed by Mr. Jack Hurdle, who runs a garage in Parksley. and usually got home from her work from an hour to an hour and a half before Mr. Gordy got in from his work, which frequently took him out of Parksley. During the spring and summer of 1928, the accused, unaccompanied by any one, visited Mrs. Gordy a number of times in her apartment when she was there alone, usually between the time she returned home and the return of her husband, staying half an hour at the longest, according to the testimony of the prosecutrix. He came and went without any secrecy and was seen coming and going repeatedly by Mrs. Causey and by Miss Sallie Causey.

On the evening of the alleged rape, Mrs. Gordy got home from work about 6:30 o'clock and went to her apartment, where she was alone. According to the testimony of Mrs. Margaret Causey, which is corroborated by the testimony of both the prosecutrix and the accused, Schley Finney, the accused, came in about ten or fifteen minutes later. Mrs. Causey went into the front hall to turn on the light and when she turned it on Schley Finney was about half way up the steps leading to Mrs. Gordy's apartment. He said to Mrs.

Causey: "Good evening. Is Mrs. Gordy home?" To which Mrs. Causey replied: "I think she is," and he went on up to Mrs. Gordy's apartment.

Mrs. Gordy testifies unequivocally and with such detail as to permit of no misunderstanding of her statements that on the occasion Schley Finney, with force and violence, and against her will, while she struggled to prevent it, had completed sexual intercourse with her, so complete that she, at the suggestion of a woman friend to whom she had told what had occurred, felt the necessity of using and did use an antiseptic vaginal douche as a precaution against the possible consequences thereof. She denies that she had ever before had sexual intercourse with the accused as he testifies.

Schley Finney, on the other hand, unequivocally denies that he had sexual intercourse with Mrs. Gordy on the occasion in question. He, however, testifies to numerous prior occasions on which he had had sexual intercourse with Mrs. Gordy, both before and after her marriage, a number of the occasions being during the summer and fall of 1928. With reference to the occasion of the alleged rape, he testifies to an unsuccessful solicitation of Mrs. Gordy to permit him to have sexual intercourse with her, which was accompanied with and carried on by acts which under circumstances other than those testified to by him might well constitute an attempt to rape, but which under the circumstances testified to by him constitute solicitation to voluntary intercourse.

The testimony of Mrs. Gordy, the prosecutrix, of importance in considering the question raised by the assignment of error, makes the following narrative, which is given in the first person in order to use as far as narrative form will permit the exact language of

Mrs. Gordy as is indicated by quotation marks. Where there is no violence done to their meaning the position of statements is transposed to give orderly sequence to the narrative, for instance in her testimony the narrative of the two occasions prior to November 3, 1928, on which the accused had taken liberties with her, follows the narrative of what occurred on November 3, and was in reply to the question whether the accused had on any prior occasion insulted her or been guilty of improprieties towards her.

Mrs. Gordy testifies: Some time in the spring or early summer of 1928, Schley Finney came to my apartment when I was alone, and "grabbed me in the kitchen and kissed me. I knew that he had been drinking; and I said: 'Schley, what in the world do you mean?' I said: 'You have been drinking and you are drunk.' I said: 'Why don't you go home. Home is the place for you.' I did not think very much about it. I did get mad, but I thought maybe it was because Schley was drinking, and I could overlook it. Finally he went on down—and after that Schley came when he got ready. Nobody said anything about him coming. He was perfectly welcome.".

When his wife was working in Cape Charles, a little later in the summer, "he came by my home and if I had any supper I was only too glad to fix him some supper, and do what I could for him. So, he came up there one night and he grabbed me down the hall and started to expose himself and I told him to get out from there, I did not want him up there. And I said: 'I am just going to tell Clarence (her husband) about this when he comes home. I am just not going to have it because it will just go from bad to worse.' I told Clarence, but think he did not say anything to Schley about it.

"Schley came back after this happened to apologize, and said he was sorry and so I accepted in one way and again I did not, because I did not like the way Schley did, so I did not bother myself with him. I did not speak to him or anything. My visits ceased around Nell's (the wife of accused). I did speak to him but I was not friendly with him. After I told him not to, he did not come any more unless Clarence was there, until this night, which was some four or five weeks afterwards, but he came three times thereafter when Clarence was there. On November 3, 1928, I got home about 6:30 o'clock in the evening, and about five or ten minutes thereafter, while I was in my bedroom, I heard a voice and it sounded like Schley and I stepped to the light and I turned the light off right quick. And I went to the door and opened the door and listened and at that time heard him on the head of the stairs; and I pushed the door to right easy. I was afraid to release the knob, thinking he would hear it." * * "But before I could release the knob, he had taken hold of the knob and kind of pushed me right in with the door. I stepped back and turned the light on. I said: 'Schley, what do you want?' He said: 'Nothing.' I said: 'You take nothing and go down from here. I don't want you up here. You know I told you to stay down there from here and I meant for you to stay down.' Several other words passed, and finally I said: 'I told you to stay down from here. I told Clarence about that.' And he says: 'You have?' And when he says: 'You have?' that is when he grabbed me; and by this time I had backed to the cedar chest and was sitting there, and broke down, and was crying. And he grabbed me and pulled me up from there and slung me around in the middle of the floor, and in doing that the rug was

torn up from the floor, and then he took me up and just threw me backwards on the bed. So, I asked him to let go of me and I told him I was going to holler for help. I said: 'You let go of me, let go and go down from here.' He would not do it and proceeded on. By this time he had pulled my bloomers down around my knees and had me on the bed holding me with one foot. Then is when the scuffle began. I began to kick and fight him as long as I could. At that time I had an awful cold and was out of breath, and I stood all I could stand. So the picture on the wall really was knocked down, and where I scraped my feet against the wall the impression was there, and my hair was torn down, and one of my shoes was off and my earring was off and his watch was on the bed. So just as soon as the act was over, he jumps from the bed and runs down stairs. As he went out he cursed me and said: 'Now cry;' and, using an epithet which I hate to repeat, I said: 'You will pay for this.' While this was going on, I hollered for Mrs. Causey twice and he put his hand over my mouth to keep anyone from hearing me. He never removed his overcoat and he was not up there more than eight minutes at the longest—five to eight minutes."

In response to the question: "Can you demonstrate to this jury just how Schley Finney accosted you, took hold of you, how he held you, or how he forced you to submit to this sexual act?" Mrs. Gordy proceeds:

"Well, he grabbed me there in the floor and I tussled with him until when he raised me off the floor I could not do anything else. When he got my feet off the floor, and then when he threw me on the bed and he reached for my bloomers, though before he pushed me on the bed, and when he pulled them down around

my feet I just kicked and scrambled as long as I could, and when I kicked him backwards off the bed, I drew my foot up and put it on his breast and kicked him backwards off the bed, and that is when he come at me like a bull dog and grabbed me by the throat and I begged him to let go of that. I thought he was going to choke me. The other foot was not free. I suppose it must have been my bloomers. I don't know what really was holding it, but I could not use it after a while. After he caught me like he wanted me I guess, and I couldn't do anything else, and I was just completely exhausted any way."

Under further questioning by the Commonwealth's attorney, Mrs. Gordy testifies:

"Q. Mrs. Gordy, as a matter of fact, tell the jury whether or not Schley Finney had sexual intercourse with you on that night.

"A. He positively did.

"Q. Was it with your assent, consent or permission?

"A. No, sir; it was not with any permission whatever.

"Q. Was it by the exercise on his part of force?

"A. Why, yes; he certainly forced it all right.

"Q. Have you ever had sexual intercourse with Finney in your life other than this time that you are relating?

"A. No, sir."

Mrs. Gordy's account of what took place after the accused left is as follows:

"He went down stairs, and I jumped and grabbed my coat off the door. I had thought enough to leave the bed. I did not touch the bed at all. Everything was torn up on it, and the mud was all over my bed off his feet, so I knew Mrs. Causey would not understand." * * "I ran out of the house behind him, and

he disappeared." * * "I knew Mrs. Causey was deaf and would not understand and there was no need to go to her, and I thought of Mrs. Hurdle. I felt as near to her as any one to go to with my troubles, and I went to her. When I went to Mrs. Hurdle's I was wearing odd shoes. One of my shoes had been pulled off in the struggle and was lying on the bed. I wore odd shoes because I did not touch anything on the bed. I went to my chifforobe and taken the odd shoe and wore it to Mrs. Hurdle's in order to leave it there for her to see." * * "I told her (Mrs. Hurdle) I couldn't come in, I wanted her to come and go home with me. We went to the house and I showed her the room and all, and she says: 'My God, Mrs. Gordy, what in the world has happened.' I said: 'I don't know, Mrs. Hurdle, what has happened.' She said: 'Have you protected yourself?' I said: 'No, Ma'am, I have not. I never gave it a thought.' So she goes down to my kitchen and lights the stove and put on some water and then I took a douche with some disinfectant in it. After this we locked the door to the room, and went to Mr. Hurdle's office, and from there called up my husband, who was in Onancock, over the phone. When he came we went to the apartment and took a look at the room, after which the matter was reported to the authorities. I did not tell Mrs. Causey anything about this matter; but the following morning (Sunday) about half past ten I told Miss Sallie Causey about it."

During the cross-examination of Mrs. Gordy by counsel for the accused the judge interjected in the instances set forth below, in none of which had any objection been made by counsel for the Commonwealth:

"Q. Now Mrs. Gordy, you stated a moment ago that

some time in the spring of 1928, Schley Finney kissed you and you told him not to do that, that he had been drinking and ought to go home. Is that correct?

"A. I did not say ought to. I told him to go home, it was the place for him."

Interjection by the court: "Mr. Somers, in cross-examining the witness put into her mouth such words as she uses. She did not say you ought not to do that and you ought not to do that. There is no testimony to that effect, sir. When you attempt to cross-examine her, quote her language which she used accurately, if you please, or leave it off if you cannot."

Again while counsel for accused was cross-examining Mrs. Gordy as to the number of times accused had visited prosecutrix after the occasion on which she had testified he grabbed her in the hall and exposed himself, the court interjected as will appear from the below extract from the transcript of the evidence:

"Q. By counsel for accused: How many times did Schley Finney come to your house between the summer when this flagrant violation of the improprieties occurred and November 3, 1928; how many times did he come to your house between those dates?

"A. I don't know. He stayed away two or three weeks after that and when he did come he claimed he came to apologize, and the rest of the times he came, I think, was three times. That made four times in all.

"Q. You accepted this apology did you?

"A. No, sir. I did in one way and I did not in another.

"Q. How do you mean you did and you did not?

"A. I mean I tried to treat him right, but I just spoke to him and that is all. I did not act friendly towards him.

"Q. You say he visited your house three times after that?

"A. After the apology."

Interjection by the court: "Don't ask her over and over again about those visits. Her answer was very distinct."

A little later the court interjected again; under these circumstances:

"Q. How long had you been up in your room before Schley Finney came?

"A. Not more than five to eight minutes. I don't know for sure.

"Q. You did not smoke any cigarettes up there before he came, did you, Mrs. ——?

"A. No, sir."

Interjection by the court: "Mr. Somers, the court does not think that is a proper question for you to ask the witness. The members of my family are not permitted to indulge in it, and if she does that is no affair of yours whether she does or not."

Mr. Mapp (counsel for accused): "As stated in the opening statement, we expect to show there was cigarette smoke on the stairs at the bath room."

The Court: "Ask her if she smokes, and if she does, did she smoke on that occasion."

A little later while Mrs. Gordy was being cross-examined with reference to hearing the approach of Schley Finney and his entrance into her room, the court interjects:

"Q. Did you hear him say 'good evening' to Mrs. Causey: 'Is Mrs. Gordy home?'

"A. No, sir; I did not hear that. I only heard his voice. I didn't know what he said.

"Q. Did you attempt to lock the door?

"A. No, sir; I didn't have time.

"Q. You heard him coming from the steps, up the steps ———."

Interjection by the court: "Don't argue with the witness, Mr. Somers. You asked her if she attempted to lock the door and she answered no, she didn't have the time."

Still later the court intervened while Mrs. Gordy was being cross-examined as to her testimony that she called twice for Mrs. Causey.

"Q. You stated in your direct examination that you called twice and then did not call any more. Now, after Schley Finney was leaving, or when he was having."

Interjection by the court: "Didn't she state in that connection that the defendant put his hand over her mouth, Mr. Somers?"

Mr. Somers: "Yes, sir."

The court: "Be fair with the witness. You don't mean she voluntarily desisted, under her statement. I think that is not fair treatment of the witness on cross-examination."

The last instance of this during the cross-examination of Mrs. Gordy was while she was being cross-. examined with reference to her conversation about this matter with Miss Sallie Causey.

"Q. Did not Miss Sallie Causey say to you: 'Mrs. Gordy, do you think that Mr. Finney intended to criminally assault you,' and that your reply was: 'Yes, I think he intended to do so.'

"A. Well, Mr. Somers, if I said it I don't recall at all.

"Q. You were not excited at all when you were telling Miss Sallie Causey about it next morning, were you?"

Interjection by the court: "Don't argue with the witness, Mr. Somers."

Mrs. Gordy's testimony was that immediately after the alleged assault she went to the home of Mrs. Jack Hurdle, the wife of her employer, and got her to come back to her (Mrs. Gordy's) room. Mrs. Hurdle, who was introduced as a witness for the Commonwealth, in reply to the question: "What was her (Mrs. Gordy's) condition when she came to your door?" says:

"She was in a very nervous condition. She came to my door crying and she said: 'Mrs. Hurdle, if you have ever been a friend to anybody, come with me home. I am nearly crazy.' I said: 'What is the matter, Mrs. Gordy? Come in and tell me.' She said: 'Let me stay on the porch.' I said: 'Come on in, you have a terrible cold. Come in.' She said: 'No, I can't come in. I can't come in.' And her hair was all down in her face and I said: 'What has happened?' And she said: 'Come with me, let me show you and let me tell you.'"

Continuing, Mrs. Hurdle testifies that she went with Mrs. Gordy to her apartment, and that Mrs. Gordy did not tell her what had happened until just as they entered Mrs. Gordy's bedroom, when Mrs. Gordy said to her:

"Mrs. Hurdle, I want to show you. Schley Finney has been here and taken advantage of me and I want to show you so you will not have any doubt."

Mrs. Hurdle also testifies that Mrs. Gordy's bedroom was in "an utter state of chaos;" that "it looked as though a cyclone had struck it;" that "the curtains were pulled down from the windows and the rugs were all harum-scarum on the floor, and the bed looked like somebody had wrung the counterpane in his hand and there was mud all over the counterpane and there was a gentleman's watch and a piece of earring on the

bed;" that Mrs. Gordy showed her that she was wearing odd shoes, and said to her: "I have got on one shoe of one kind and one of another;" and that there on the bed was the fellow to one of the shoes Mrs. Gordy was wearing.

Mr. Everett P. Parks, the sheriff of Accomac county, was introduced as a witness for the Commonwealth. He testified that he went to the Gordy apartment about twelve thirty o'clock on the night of November 3, 1928; that Mrs. Gordy, her husband, and certain others were with him; that "the bed was torn up some;" "A picture was sort of displaced on the wall," and there were "foot prints on the wall, shoe heel prints;" and "the curtain was disarranged a little;" that he found a watch and chain, piece of earring, a hairpin and one slipper on the bed; that he was with Mrs. Gordy from twenty to thirty minutes that night; that he met her at Mrs. Hurdle's home and she went with him and the others to the Gordy apartment.

As to Mrs. Gordy's condition about twelve o'clock that night, the sheriff testifies on cross-examination as follows:

"Q. I am going to ask you to state to the court and jury what her condition then was.

"A. She seemed upset some.

"Q. Will you say what you base that on? What did she do? What did she say?

"A. By the way she acted.

"Q. What did she say?

"A. Well; she said that Schley Finney had—I don't remember anything exactly that she did say that I can refer to my memory now, Mr. Mapp.

"Q. Did she cry any?

"A. She did not break right out and cry, but I could see there were tears in her eyes.

"Q. Did she seem to be hurt or mad?

"A. Well; I should say she was both."

After the Commonwealth had introduced several other witnesses, and had closed its case, the defense introduced the deposition of Mrs. Margaret Causey, and then put Schley Finney, the accused, on the witness stand. Schley Finney denied unequivocally that he had sexual intercourse with Mrs. Gordy on the occasion in question; but testified he had had sexual intercourse with Mrs. Gordy a number of times, both before and after her marriage, and had had sexual intercourse with her some four or five times during the summer and fall of 1928; that after she was married he did not have sexual intercourse with her for a year and a half or two years; and that the first time he had sexual intercourse with her in her apartment at Mrs. Causey's home was during the summer of 1928. The circumstances under which this took place as related by him, the accused, have so much in common with Mrs. Gordy's narrative of the occasion on which she says the accused undertook to take gross liberties with her in the hall of her apartment, which she repulsed, as to identify the testimony of the accused as referring to the same occasion.

The accused relates several other instances after the above mentioned occasion on which he says he had sexual intercourse with Mrs. Gordy, and others upon which he tried to induce her to do so, but she resisted him and finally refused to yield herself to him; admits that he had been drinking on the evening of November 3, 1928, and gives the following account of what took place that evening:

"When I started up the steps she (Mrs. Causey) opened the door leading into her living room and dining room then, and went out and turned the light on.

I said: 'Good evening, Mrs. Causey. Is Mrs. Gordy home?' She said she was home. When I got to the head of the stairs there was no light in Mrs. Gordy's bedroom; and when I got up to the top of the steps or near the top I asked her to turn the light on, which she did.

"I just walked in. The door was open that much (indicating) and when I went here I naturally put my hand on the knob and went on in." There was no evidence of her holding the door. "When I went into the room she was as far as this box there from the door. She asked me what I wanted and where Nell, my wife, was. I put my arms around her and kissed her. She didn't say anything or do anything." The narrative of the accused then proceeds: "I sat down in the chair first and we were talking. Then I got up and sat down on the edge of the bed." She was standing just in front of me. Then "I pulled her down and sat her down on the edge of the bed with me and I leaned her back and kissed her" and fondled her and tried to induce her to let me have sexual intercourse with her (the details of solicitation we omit); but she would not yield herself to me.

"Then I asked her what the hell was the matter with her, she had done it before, why she didn't want to do it now. And she said she didn't want to, she was not going to do any more. I said: 'What's the matter? Too much Jack Hurdle?' She wanted to know where the hell I got that from. I said: 'I hear it down the street, your name and Jack Hurdle's connected together. Hear it discussed down the street.' And she cursed me and I saw she was not going to let me do it; and that is when I stopped and got up.

"As I went down stairs she used the language to me that she says she did, and said: 'You will pay for it.

You will pay for this.' I did not use any more persuasion or force on this occasion than I had used on other occasions when she yielded herself to me; and I desisted as soon as I saw positively that she would not yield herself to me. I did not pull her bloomers down. I started to put my hand up her leg and she wouldn't let me do it, and I did not try any more. She did not seem to be mad much until I said something about Jack Hurdle. She got mad with me because I accused her of Jack Hurdle. After that she threatened to tell her husband. She at no time hollered, and I did not put my hand over her mouth, choke her, or try to keep her from hollering."

While being examined by his counsel the accused was asked:

"She has introduced in evidence a dress that is ripped under the sleeve. Do you know whether the dress was ripped by you or not?" To this the accused replied: "No, sir; I don't." At which point the court interjected: "Ripped, or bursted I should say."

After the accused had testified, the defense introduced Sam Baker as a witness, and then put Miss Sallie Causey on the witness stand.

Miss Sallie Causey testified that she was not at home on Saturday afternoon or evening, November 3, 1928, until about eleven o'clock that night; that she heard people in the front hall that night, but did not learn of the alleged assault on Mrs. Gordy until on Sunday morning, about the middle of the morning, when Mrs. Gordy came to her and told her about it. After which her testimony proceeds as follows:

"Q. What did she (Mrs. Gordy) tell you?

"A. Well; she really told me very little. She told me of the excitement that had been in the house and that Mr. Finney had been coming in.

"Q. What was the first thing she said to you?

"A. Well; as I remember, she said she guessed I thought there was a lot of excitement going on.

"Q. What else did she say?

"A. And that Mr. Finney had come in and attacked her, as I remember.

"Q. What was her condition, her manner at that time, Miss Sallie?

"A. Well; I can hardly say, Mr. Rew. Just as it usually is.

"Q. Did you have a conversation with her again with reference to this trouble?

"A. Yes, sir; I think one time after.

"Q. Before I get to that, on Sunday morning I asked you what her manner was. What did she say took place there?"

Interjection by the court: "I think she has already answered that, Mr. Rew. She has answered what her manner was. She said very much as usual. She said she spoke about the commotion in the house, the trouble in the house, and even specifically stated that Finney had come in and attacked her."

"Q. Did she say anything else on Sunday morning?

"A. Well; she told me of his having come up, that she did not hear him until he was in her room. He came up and walked in her bedroom."

Mr. Ruediger: "Why can't he ask her what she told her without pointing out specifically what he wants and putting words in her mouth?"

The court: "That is, of course, the recognized manner of examining a witness."

"Q. What else did she say, Miss Sallie?

"A. Well; she told me he came in her bedroom and picked her up and put her on the bed. That was all. She told me very little because we were interrupted.

"Q. Did you have another conversation with her regarding this matter?

"A. And she told me something he had said to her in going down stairs, and that was just about the amount of our conversation. Someone came in.

"Q. Did she tell you what she said before he went down the stairs?

"A. She did not say anything that I remember that he said. She told me something she said to him going down stairs, is all I remember.

"Q. Did she curse him as he went down the stairs?

"A. Well; I think she did. She called him something as he went down the stairs.

"Q. Did you have another conversation with her regarding this matter?

"A. Yes, sir."

The court: "That is the third conversation now. I thought you had gone over two conversations, first one in the morning and then another."

Mr. Rew: "No, sir. I asked her the question but she went on before I finished."

"Q. By Mr. Rew: I am now referring to the second conversation. When did that take place, Miss Sallie?

"A. Well; some days later. I don't just remember.

"Q. Can you tell what was said at that time?

"Q. By the court: Miss Causey, have you repeated what was said in the second conversation, or any part of it?

"A. No, sir; I have not.

"Q. By the court: Well, please proceed and let us get it over.

"A. The only thing I remember asking her at all, I asked her how he went down stairs. I had heard various ways, and she told me he went down stairs ahead of her, but there was very little to our conversation about it. I talked to her very little about it.

"Q. By Mr. Rew: Did you ask her—"

Mr. Ruediger: "She has detailed the whole conversation. Mr. Rew wants to put something in her mouth."

The court: "I don't think that is proper examination."

"Q. By the court: Miss Causey, have you related all that you can recall of Mrs. Gordy's statements to you in the second conversation? If not, please proceed to relate it without counsel having to specifically interrogate you?

"A. Well, the conversation was very short. There was really nothing very much to it.

"Q. By Mr. Rew: Have you told all that you said to her and all she said to you in the second conversation?

"A. I don't know that I have. I don't just recall exactly what the conversation was.

"Q. Did you ask her a question with reference to this matter?

"A. The question I asked was about his going down stairs.

"Q. Did you ask her any further question regarding this matter?"

Mr. Ruediger: "She said that was the only question. She has answered that, Mr. Rew."

"A. That is the only question I remember asking her on the second conversation."

The court: "That seems to me to cover the examination, Mr. Rew."

Mr. Rew: "If your Honor please, our information is that this witness—"

Mr. Ruediger: (Interposing) "Don't tell the witness what you are going to say right here before the jury."

The court: "Did the information come from the witness herself, or from someone else?"

Mr. Mapp: "Yes, sir; from her, yesterday afternoon."

Mr. Rew: "It is very material."

The court: *"If it is, it is strikingly different from what you have asked so far."*

Mr. Mapp: "We desire to save the exception to that statement of the court."

The court: *"The court will withdraw it. I was about to say that if you gentlemen want to specifically call this witness's attention to some phase of a statement, or a question, or a conversation, I was going to enable you to do so because the witness has apparently forgotten it or lost sight of it. I do not wish the jury to understand that my attitude is criticism of testimony at any time of any witness. I try to abstain from that."*

The error assigned by the accused is that the court erred in making the statement: "If it is, it is strikingly different from what you have asked so far;" that the statement made by the court in withdrawing the statement did not cure the error, but made it worse, and that in the light of the attitude of the court as shown by former and succeeding interjections and remarks made by the court, the statement was prejudicial to the accused.

After Miss Sallie Causey testified in part as follows:

"Q. Miss Causey, did you ask Mrs. Gordy this question, and if so, what was her answer: 'Mrs. Gordy, do you think he really intended to criminally assault you?'

"A. Yes, sir; but that was Sunday morning, the first talk that I had with her.

"Q. What was her answer?

"A. Her answer was she thought so. She said: 'Yes, I do.'

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. In either of the conversations which you had with Mrs. Gordy, either the first on the Sunday morning or the second which you had a few days afterwards, did she say anything to indicate to you that she had been criminally assaulted?

"A. No, sir."

Immediately following Miss Sallie Causey on the witness stand the defense put Aaron Byrd on the stand. When Mr. Byrd had been asked where he lived, the court interjected with the following statement:

The court: "Gentlemen, let us be a little more direct and see if we cannot make more rapid progress. I realize very acutely the situation that all of you gentlemen are in and want to show you every consideration, but let's do not waste any time in the examination of this witness. The court thinks much has been wasted in the examination of them."

This interjection came almost immediately after the counsel for the accused had finally, after a rather difficult examination, elicited from Miss Causey, who was apparently rather reluctant to talk about this matter, the very material statement that Mrs. Gordy in neither of her conversations with her said anything to indicate to Miss Causey that she had been criminally assaulted.

In the light of the testimony in this case the veracity of the prosecutrix and her mental attitude towards, and in the light of, what she had testified had taken place on the evening of November 3rd was most material. The fact that when telling Miss Causey of this on the following morning Mrs. Gordy's "condition, her manner at the time" was "just as it usually is," was significant and material. Mrs. Gordy had testified

in detail that she heard the accused while he was coming up the stair steps, and at once turned the light out; that she then went to the door, and opened the door and listened, and at that time heard him at the top of the stairs; that she shut the door but before she could release the knob the accused pushed her right in with the door. Miss Causey had testified that Mrs. Gordy told her that "she (Mrs. Gordy) did not hear him until he was in her room." This had a material bearing upon the verity of the account given by Mrs. Gordy of what took place that evening.

While the court states that it withdraws its statement which was in effect that Miss Causey had been asked no material question and had testified to nothing material, in its withdrawal it reiterates and rather aggravates the statement by the implication that if the witness knows anything material she has forgotten it or lost sight of it. The withdrawal does not cure, but on the contrary aggravates the error committed by the court.

In the state of the evidence in this case and in the light of the other interjections by the court, which, with this interjection, tend strongly to convey the impression that the court was impatient of, and unfavorably impressed by, the defense of the accused, we are of opinion that the court committed prejudical error in the statement assigned as error.

The judgment of the court will be reversed, and the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed.*