## Richmond

### HERBERT WINFIELD, JR.

### v.

### COMMONWEALTH OF VIRGINIA

March 11, 1983.

Record No. 812250.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson,*
Stephenson, and Russell, JJ.

---

\* Justice Thompson participated in the hearing and decision of this case prior to the
effective date of his retirement on March 2, 1983.

212

H. Taylor Williams, IV (Williams & Chappell, on brief), for appellant.

Roscoe C. Roberts, Assistant Attorney General (Gerald L.. Baliles, Attorney General, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

In this case of first impression involving a prosecution for sexual assault, we must examine the admissibility of evidence of the complaining witness's specific acts of sexual conduct with persons other than the accused, in light of the "rape shield" provision of Code § 18.2-67.7.[1]

---

[1] § 18.2-67.7. Admission of evidence.—A. In prosecutions under this article, general reputation or opinion evidence of the complaining witness's unchaste character or prior sexual conduct shall not be admitted. Unless the complaining witness voluntarily agrees otherwise, evidence of specific instances of his or her prior sexual conduct shall be admitted only if it is relevant and is:

1. Evidence offered to provide an alternative explanation for physical evidence of the offense charged which is introduced by the prosecution, limited to evidence designed to explain the presence of semen, pregnancy, disease, or physical injury to the complaining witness's intimate parts; or

2. Evidence of sexual conduct between the complaining witness and the accused offered to support a contention that the alleged offense was not accomplished by force, threat or.intimidation or through the use of the complaining witness's mental incapacity or physical helplessness, provided that the sexual conduct occurred within a period of time reasonably proximate to the offense charged under the circumstances of this case; or

3. Evidence offered to rebut evidence of the complaining witness's prior sexual conduct introduced by the prosecution.

B. Nothing contained in this section shall prohibit the accused from presenting evidence relevant to show that the complaining witness had a motive to fabricate the charge against the accused. If such evidence relates to the past sexual conduct of the complaining witness with a person other than the accused, it shall not be admit-

Herbert Winfield, Jr., was indicted for the forcible rape and forcible sodomy of Sandra Nelson. Prior to the trial, Winfield gave written notice to the Commonwealth, pursuant to Code § 18.2-67.7(B), that he wished to offer the following evidence as to Sandra's prior sexual conduct with others:

(1) Testimony of Leon Moore that Sandra Nelson agreed to have sexual intercourse with him on the condition he pay her twenty dollars; that he had sexual intercourse with Sandra Nelson; that he did not pay her the twenty dollars; that Sandra Nelson stated that if he did not pay her the twenty dollars that she would tell his wife; that he paid her twenty dollars; that Sandra Nelson has a reputation in the community for being unchaste and immoral.

(2) Testimony of Lawrence Winfield that Sandra Nelson asked him if she should have sexual intercourse with Leon Moore for money; that Sandra Nelson stated to him that she needed the money so she would have sexual intercourse with Leon Moore; that Lawrence Winfield has had sexual intercourse with Sandra Nelson; that he paid her ten dollars after having sexual intercourse with her; that Sandra Nelson has a reputation in the community for being unchaste and immoral.

ted and may not be referred to at any preliminary hearing or trial unless the party offering same files a written notice generally describing the evidence prior to the introduction of any evidence, or the opening statement of either counsel, whichever first occurs, at the preliminary hearing or trial at which the admission of the evidence may be sought.

C. Evidence described in subsections A and B of this section shall not be admitted and may not be referred to at any preliminary hearing or trial until the court first determines the admissibility of that evidence at an evidentiary hearing to be held before the evidence is introduced at such preliminary hearing or trial. The court shall exclude from the evidentiary hearing all persons except the accused, the complaining witness, other necessary witnesses, and required court personnel. If the court determines that the evidence meets the requirements of subsections A and B of this section, it shall be admissible before the judge or jury trying the case in the ordinary course of the preliminary hearing or trial. If the court initially determines that the evidence is inadmissible, but new information is discovered during the course of the preliminary hearing or trial which may make such evidence admissible, the court shall determine in an evidentiary hearing whether such evidence is admissible. (1981, c. 397.)

(3) Testimony of Denise Daniels that Sandra Nelson has stated to her that a man was going to give Sandra Nelson $100.00 if she would go to bed with him and she decided not to do it but that she allowed him to feel her breasts for $25.00; that Sandra Nelson has a bad reputation in the community.

(4) Testimony of Towana Parham that Sandra Nelson has stated to her on three different occasions that Sandra Nelson has been to bed with different men; that Sandra Nelson stated to her Sandra Nelson was pregnant but did not know who the father of the child was; that Sandra Nelson has a bad reputation in the community.

(5) Testimony of Anthony Branch that Sandra Nelson has an unchaste and immoral reputation in the community; that Sandra Nelson has on several occasions had sexual intercourse with various men and then told the man's wife or girl friend of the incident in an effort to create trouble between the man and his wife or girl friend.

(6) Testimony of Carol Jackson that Sandra Nelson has an unchaste and immoral reputation in the community; that he has had sexual intercourse with Sandra Nelson; that he had a friend tell him he paid Sandra Nelson $150.00 to have sexual intercourse with her; that Sandra Nelson has had sexual intercourse with a man and then told the man's girl friend about the incident in an effort to create trouble between the man and his girl friend.

The matter was set for hearing in advance of trial for a determination of the admissibility of the proffered evidence. For the purposes of the hearing, the Commonwealth stipulated that the six witnesses would testify as indicated in the notice quoted above. Accordingly, their actual testimony was dispensed with, and the parties submitted the question of admissibility to the court as a matter of law. The court determined that the evidence was "inadmissible . . . as evidence relevant to show that the complaining witness had a motive to fabricate the charge against the accused." This ruling presents the dispositive question on appeal.

At Winfield's subsequent jury trial, the Commonwealth's evidence showed that Sandra, nineteen years of age, and Winfield, thirty-two, lived in the same apartment development in Chester-

field County and were on friendly terms. On the afternoon of July 24, 1981, Sandra asked Winfield to give her a ride in his car to a "night spot" in Petersburg that night. She testified that long after dark, he picked her up and drove her to a rural area in Dinwiddie County and frightened her by telling her they were in an area where the "KKK" met and that she would be caught by the "KKK" if she attempted to leave the car. He then stopped the car, threatened to hurt her if she resisted, forcibly removed her clothing, pinned her hands behind her and forcibly subjected her to rape and sodomy. She testified that she cried and attempted to push him away but "just didn't have the strength." Afterwards, driving back toward Petersburg, the defendant stopped at a service station and went inside to buy cigarettes. At this point, Sandra testified, she jumped out of the car and ran to three strangers in a truck, offering them all the money in her purse if they would take her home. When she arrived home, she told a friend that Winfield had raped her and called the police.

A state trooper interviewed her at her apartment at about 2:00 a.m. on July 25th, within thirty minutes of her call. He found her upset, nervous, and crying. He saw no signs of physical injury. She accompanied him to Dinwiddie County and pointed out the area in which she said the offenses had occurred. Sandra and the trooper were the only witnesses called by the Commonwealth.

Winfield testified that he had known Sandra for six months and that they had frequent discussions concerning sex. On the afternoon of July 24, 1981, he said that she asked him if he thought she should spend the night with another man who had offered her $150.00. Winfield responded that that was up to her, but that he would give her $50.00 for sexual favors. She agreed. About 11:00 p.m. that night, she came to his apartment and said she was ready to go with him. He drove her down Interstate 95 and she suggested that they stop at a motel. He told her that he could not afford a motel room and drove her to the end of a country road. He testified that they then engaged in sexual intercourse with Sandra's consent and willing participation. On the way home, Sandra asked him for the promised $50.00. He told her that he had it at home, but not with him. She became angry and said that she was going to have him arrested. When he stopped at a service station to buy $2.00 worth of gas and some cigarettes, she got into a car with somebody he didn't know and left. He returned home and went to bed. Later, he said, he was awakened by Sandra's

boyfriend who asked him about the money and threatened him with jail. Soon thereafter the police took him to the Dinwiddie County jail on a rape charge.

Winfield's testimony was partially corroborated by three defense witnesses. William Swann testified that he had been present during the afternoon conversation between Sandra and Winfield and had heard Sandra agree to accept $50.00 for sexual favors. Sandra admitted on cross-examination that Swann had been present, along with another man, when she had an afternoon conversation with Winfield. Clifford Coles, a cousin of Sandra's, testified that she later told him that she had had sexual intercourse with Winfield, that she "wished he had given her $50.00," and that she was "going to make sure he gets some time." James Harris, who knew both parties, testified that he saw them sitting together in Winfield's parked car late on the evening of July 24th and that Sandra was sitting close against Winfield, who had his arm over the seat. Harris stopped to talk, but Sandra seemed to be in a hurry, saying: "Ah, come on, let's go." Harris left, and heard of Winfield's arrest for rape the next day.

The jury found Winfield guilty under both indictments and fixed his punishment at five years confinement in each case. The court overruled his post-trial motions and imposed the two sentences to run consecutively.

We first consider Winfield's principal assignment of error: that the trial court erred in ruling, as a matter of law, that the evidence of the six witnesses proffered in his notice was not relevant to show a motive to fabricate the charge against him.

Prior to July 1, 1981, Virginia followed the well-settled rules of the common law that the accused in a rape case, asserting the defense of consent, might introduce evidence of the previously unchaste character of his accuser. *Wynne* v. *Commonwealth*, 216 Va. 355, 218 S.E.2d 445 (1975). This could only be shown by proof of general reputation of the complaining witness in the community for unchastity or prostitution. *Burnley* v. *Commonwealth*, 208 Va. 356, 158 S.E.2d 108 (1967); *Powell* v. *Commonwealth*, 179 Va. 703, 20 S.E.2d 536 (1942). The reason for the rule was set forth in *Bailey* v. *Commonwealth*, 82 Va. 107, 110-11 (1886):

This offence may be committed as well on a woman unchaste, or a common prostitute, as on any other female. In [the] matter of evidence, however, want of chastity may,

within recognized limits, be shown as rendering it more probable that she consented.

This rule has been subjected to increasing criticism in recent years. Commentators observed, first, that there is no logical connection between a woman's willingness to submit to the defendant accused of raping her, and her willingness to share intimacies with another man with whom she might have had a special relationship. This is particularly true since the law always permitted the defendant to show that he personally had a prior sexual relationship with the complaining witness. *See Finney* v. *Commonwealth*, 154 Va. 808, 152 S.E. 555 (1930). Second, proof of general reputation in the community has very little probative weight. In a transient urban society, it often boils down to the uninformed opinion of a character witness. Finally, such reputation evidence was extremely prejudicial to the rape victim. It tended to turn the trial into a inquiry as to her chastity, rather than the guilt of the accused. Defense counsel was enabled to focus the trial so effectively upon her prior life that she was understandably reluctant to testify. The result was that many sexual assaults went unreported because of fear of the traumatic effects of prosecuting them. *See* Kneedler, *Sexual Assault Law Reform in Virginia—A Legislative History*, 68 Va. L. Rev. 459 (1982); Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum. L. Rev. 1 (1977); Tanford and Bocchino, *Rape Victim Shield Laws and the Sixth Amendment*, 128 U. Pa. L. Rev. 544 (1980).

The legislative response was a series of "rape shield" laws, adopted by forty-seven states and by the Congress. Most of these limit or prohibit the admission of general reputation evidence as to the prior unchastity of the complaining witness, but some, like ours, permit the introduction of evidence of specific acts of sexual conduct between the complaining witness and third persons in carefully limited circumstances. *See* Tanford and Bocchino, *supra* at 592-602.

The application of these laws has presented the courts with the concomitant problem that no legislation, however salutary its purpose, can be so construed as to deprive a criminal defendant of his Sixth Amendment right to confront and cross-examine his accuser and to call witnesses in his defense. *Davis* v. *Alaska*, 415 U.S. 308 (1974), (state law shielding disclosure of juvenile-offender status of a prosecution witness is subordinate to defendants' right of con-

frontation), and *Washington* v. *Texas*, 388 U.S. 14 (1967), (state law barring accomplice testimony is subordinate to defendant's right to offer evidence in his defense.) The analogy of these cases to the "rape shield" laws is plain. *See generally* Annot., 1 A.L.R.4th 283 (1980). Some jurisdictions have held such laws unconstitutional where they purport to preclude the defendant from showing the prior sexual conduct of the complaining witness. *See, e.g., State* v. *Jalo*, 27 Or. App. 845, 557 P.2d 1359 (1976). Others have, in order to give the statute a constitutional interpretation, implied an exception where the trial court, in an *in camera* hearing, makes a preliminary determination that the proffered evidence would be relevant and probative on the issue of consent. *See, e.g., State* v. *Howard*, 121 N.H. 53, 426 A.2d 457 (1981).

Instructed by the experience of other jurisdictions, and with the evident purpose of steering a safe course through these shoals, the Virginia General Assembly enacted Code § 18.2-67.7 as a part of a sweeping revision of the general laws pertaining to criminal sexual assault, effective July 1, 1981. Kneedler's analysis suggests that the specific sanction given by Code § 18.2-67.7 to evidence of the victim's prior sexual conduct, for strictly limited purposes, will accommodate most of the foreseeable constitutional claims which a defendant might legitimately raise. Kneedler, *supra*, at 500-02. While the constitutional problems are instructive in determining the legislative intent as to the scope of the exceptions contained in the statute, no constitutional challenge is raised in this case. Indeed, the parties here debate only whether the proffered evidence meets the requirements of the statute—that is, was it *relevant* to show that the complaining witness had a "motive to fabricate" the charge against the accused.

Winfield argues that his defense was "contract and consent;" that Sandra, having no other way to enforce collection of her agreed fee, threatened a rape prosecution to "blackmail the appellant into payment, to obtain revenge for non-payment and to maintain her standing in her 'business community'." This, he says, was her "motive to fabricate." He argues that the excluded evidence shows a pattern of such past sexual conduct on her part, and that it is thus relevant to show her "motive to fabricate" the charge. The Commonwealth responds that the evidence amounts to nothing more than a generalized assault on the character of the complaining witness, tending to attack her credibility but not showing any particular motive to fabricate. Evidence of specific

prior sexual conduct with third persons as a general attack on credibility was, the Commonwealth argues, prohibited at common law and is still prohibited under the "rape shield" law.

On the limited record before us, consisting only of the terse representations contained in the notice quoted above, it is impossible for us to determine the entire form and extent of the proffered evidence, but certain conclusions may be drawn. In our view, the General Assembly intended to preclude evidence of general reputation or opinion of the unchaste character of the complaining witness in all circumstances. This view arises not only from the criticisms of this kind of evidence, mentioned above, which underlay the legislative reforms of 1981, but also from the fact that the new law gives a defendant access for the first time to far more probative evidence: specific prior sexual conduct with third persons, if it is relevant for the purposes set forth in Code § 18.2-67.7. All six of the proffered witnesses would testify to Sandra's bad reputation, and that part of their testimony was properly excluded.

We agree with Winfield, however, that evidence tending to show that Sandra had a distinctive pattern of past sexual conduct, involving the extortion of money by threat after acts of prostitution, of which her alleged conduct in this case was but an example, is relevant, probative, and admissible in his defense. The proffered testimony of Leon Moore appears to contain elements of this kind. If, upon an evidentiary hearing conducted pursuant to Code § 18.2-67.7(C), it tends to show such a pattern, and otherwise meets the rules of evidence, it should be admitted. *See* Kneedler, *supra,* at 501. Its exclusion as a matter of law, based only upon the description contained in the notice, is error requiring reversal.

Evidence of past sexual conduct, to be admissible under the "motive to fabricate" provisions of Code § 18.2-67.7(B), however, must show a pattern of behavior which directly relates to the conduct charged against the complaining witness in the case on trial. Thus there is a sufficient nexus between Sandra's alleged efforts to extort money by threats from others, after acts of prostitution, and Winfield's version of her conduct in the present case, to render such evidence relevant and probative of a motive to fabricate. On the other hand, the proffered evidence of most of the witnesses to the effect that Sandra had engaged in sexual acts with others for money, is a mere attack on her character, related only indirectly to the theory of the defense. It attempts to show

her reputation, by specific acts, as a prostitute, but it does not directly establish a motive to fabricate any charge against the accused.[2] Such evidence was inadmissible at common law and the new statutory scheme does not open the door to its admission.

■ Finally, any evidence of prior sexual conduct by the complaining witness must comply with the usual rules of evidence as well as the requirements of the "rape shield" law. Since general reputation or opinion evidence as to unchaste character is to be excluded, it appears probable from the defendant's notice that at least three of the proffered witnesses would relate nothing more than inadmissible hearsay. We cannot make this determination on the record before us. In an evidentiary hearing conducted pursuant to Code § 18.2-67.7(C), the trial court should ascertain whether the evidence is presented in a form which meets an exception to the hearsay rule, and is otherwise admissible.

■ Winfield also assigns error to the trial court's refusal to set aside the verdict on the ground that the evidence was insufficient, as a matter of law, to support his convictions. There is no merit in this contention. Sandra's testimony is not incredible, and would be sufficient to support the verdicts even if entirely uncorroborated. *Davis* v. *Commonwealth*, 186 Va. 936, 45 S.E.2d 167 (1947). Here, however, corroboration was supplied by the testimony of the trooper as to her prompt report of the crime and her distraught condition. *See Bailey* v. *Commonwealth*, 82 Va. at 114.

For the reasons earlier stated, the judgments appealed from will be reversed, and the cases remanded to the trial court for such further proceedings as the Commonwealth may be advised, not inconsistent with this opinion.

*Reversed and remanded.*

THOMPSON, J., dissenting in part.

As I construe the majority opinion, the only evidence in the proffer that would be admissible is (1) involving Leon Moore. The opinion states:

---

[2] This is not to say that evidence showing that the complaining witness had acted as a prostitute would never be admissible. In certain circumstances it might be directly relevant to the defense, as showing a motive to fabricate the charge. *See, e.g., State v. Blue*, 225 Kan. 576, 592 P.2d 897 (1979).

We agree with Winfield, however, that evidence tending to show that Sandra had a distinctive pattern of past sexual conduct, involving the extortion of money by threat after acts of prostitution, of which her conduct in this case was but an example, is relevant, probative, and admissible in his defense. The proffered testimony of Leon Moore appears to contain elements of this kind. . . .

. . . .

. . . Thus there is a sufficient nexus between Sandra's alleged efforts to extort money by threats from others, after acts of prostitution, and Winfield's version of her conduct in the present case, to render such evidence relevant and probative of a motive to fabricate.

The majority pays due respect to the analysis of the statute by Dean Kneedler, but omits his explication of the "motive-to-fabricate" provision:

[The provision] was intended to be quite narrow in scope, limited to instances in which evidence of the victim's prior sexual conduct creates an inference that the victim had an ulterior motive to charge the defendant with sexual assault.

. . . .

. . . Properly interpreted, therefore, the provision operates only where the motive to fabricate arises directly from the past sexual conduct. . . .

The victim's relationship with a third person may suggest a motive to fabricate the charge apart from evidence of the victim's past sexual conduct with that person. In such cases, evidence of the victim's past sexual conduct with that person should be excluded. For example, if a man finds his fiancee in bed with his best friend, and his fiancee then accuses the best friend of rape, how much evidence of the relationship between the man and his fiancee should be admitted to support the defense that the fiancee fabricated the charge? Obviously, the best friend would be permitted to introduce evidence of the victim's relationship with her fiancee as evidence that she had a motive to fabricate the charge. The provision, however, does not permit the admission of evidence of the *sexual* relationship between the victim and her fiancee unless it is the sexual relationship that gave rise to the motive to

fabricate. On the facts of this hypothetical, unless it could be shown that the victim's past sexual conduct with her fiancee gave rise to the motive to fabricate, evidence of that conduct would not be probative of a motive to fabricate and should, therefore, be excluded. An even clearer case would arise if the accused attempted to show that the victim had had prior sexual relations with third persons with whom the victim had no current relationship. Such evidence clearly would be irrelevant to the existence of a motive to fabricate. Its only use would be either to show that the victim had a general propensity to engage in consensual sexual acts or to impeach the victim's general credibility, both of which are prohibited under the new sexual assault law.

In sum, a sexual relationship may be relevant to demonstrate a motive to fabricate, but it will not be relevant in every case. Thus, under the motive-to-fabricate provision, the trial judge must consider carefully whether there is a sufficiently direct link between the past sexual conduct and the motive to fabricate to warrant admission of that conduct.

Kneedler, *Sexual Assault Law Reform in Virginia—A Legislative History*, 68 Va. L. Rev. 459, 494, 495-496 (1982).

These isolated episodes have two common ingredients: (1) sexual intercourse; and (2) the client's unwillingness to pay for the services rendered. In the first instance, compliance was effected after a threat to expose the client's conduct to his spouse; in this case, it was alleged that the collection method was an accusation of rape. The majority states there is a nexus or common link between the two. I disagree.

In the Leon Moore liaison, there was no falsehood, no motive to fabricate. Yet from this can the fact finder logically infer the motive to fabricate the charges against Winfield? Is a threat to expose the truth the same as a motive to fabricate? I do not perceive a common thread in such dissimilar conduct.

In my opinion, the Leon Moore incident is not admissible. A threat to extort money is not the legal equivalent of a motive to fabricate, and I dissent to that extent