# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

LAWRENCE POWELL V. COMMONWEALTH OF VIRGINIA.

June 8, 1942.

Record No. 2523.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Arthur E. Smith, Walter H. Scott* and *T. W. Messick,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

The accused, Lawrence Powell, was indicted for rape, by force, of Joyce Ann Akers. There was a trial by a jury which resulted in a verdict of guilty of attempted rape, and the punishment of the accused was fixed at confinement in the penitentiary for a period of five years. This verdict was carried into execution by the judgment of the court.

It is assigned as error that the court erred in refusing to set aside the verdict of the jury and grant a new trial on the ground that the verdict was contrary to the law and the evidence and without evidence to support it.

The case of the Commonwealth is predicated upon the following facts and circumstances, as found by the jury upon a conflict of evidence.

The crime was alleged to have been committed on the night of October 29, 1939. The prosecutrix was sixteen years of age on August 30, 1939. At the time of the alleged occurrence, she weighed 112 pounds and was five feet, four inches tall. The accused was nineteen years and ten months old, was five feet, eleven inches tall and weighed one hundred and seventy pounds. The prosecutrix was employed by Mr. and Mrs. Ed. Prillaman, 1201 Campbell Avenue, Roanoke, Virginia, as a nurse for their infant child. Alma Prillaman and accused are second cousins and accused frequently visited the Prillaman home, which consisted of an upper flat, or

apartment. On the night in question, the Prillamans were visiting friends in another part of the city and the prosecutrix was alone in the apartment, except for the baby.

The prosecutrix testified that between eight and nine o'clock on that night the accused called at the Prillaman home and inquired if the Prillamans were at home; that she answered in the negative; that he went upstairs to use the telephone, and in the meantime, two boys called and invited her to go to a show; that she declined, as she had to stay with the baby; that she then went upstairs where accused was; that he took hold of her and said: "Bopeep ain't you going to kiss me?" that she answered, "No, I am not going to kiss you; I am not that kind of a girl and I don't kiss boys;" that he then made an indecent proposal to her; that he began to scuffle with her; that he threw her on a lounge and took her "panties" off; that he then threw her down on the floor and got on top of her; that he was holding her hands with one of his hands; that he exposed his privates and succeeded in partially entering her person; that during the scuffle she attempted to scream and call upon the tenant in the room below for help; that accused then put his hand over her mouth and said, "Damn you, if you say anything, by God, I'll kill you;" that she was scared; that his expression was awful; that she then told accused that if he would raise the window she would do what he wanted her to do; that he got up to raise the window and she ran downstairs into the yard and screamed and hollered; that Polly Taylor, her next door neighbor, was on the porch and that she told her, "He threatened to kill me;" that after she screamed for Polly, accused came out of the house and ran across the yard.

What then transpired was narrated by Miss Taylor. She testified that she lived next door to the Prillamans and that on the night of October the 29th she had attended church services; that as she arrived home she heard someone scream; that she saw "this boy" run across the yard; that Joyce Ann came around the side yard; that she was screaming and crying and hollering; that she asked, "What is the matter?" that Joyce Ann was so excited she was unable to tell her; that she did state, "He threatened to kill me;" that she then asked her

to call the Prillamans; that she screamed and started crying and then gave the 'phone number of the Prillamans.

J. H. Puckett, a police officer of the city, testified that in response to a 'phone call which he received about 9:30 o'clock on the night of the occurrence, he went to the Prillaman home; that he saw Mrs. Prillaman who seemed like she was under a great strain; that she informed him that Joyce Ann would tell him what had occurred; that he went upstairs where the girl was; that she was "all broken up;" that her condition was such that she couldn't talk; that she was in hysterics; that finally Joyce Ann told him that the accused came to the house and attacked her. Without objection, the witness stated in detail the occurrence as related to him by the prosecutrix. As his version of the affair borders on the nauseous, we shall not repeat it. However, it must be stated that the evidence adduced revealed an appalling situation. The officer, Puckett, further stated that he had Mrs. Prillaman examine the prosecutrix in his presence; that the examination revealed a large red spot about four inches long in the shape of a hand on the leg of the prosecutrix.

Mrs. Prillaman testified that her examination of the prosecutrix did not reveal any serious injury to her person and that she was not examined by a doctor.

Testifying in his own behalf, the accused stated that, at the solicitation of the prosecutrix, he did kiss the prosecutrix and indulged in what he termed "a little petting." He denied specifically the charge of rape and denied *in toto* the charge of sexual intercourse. As a further defense, the accused introduced witnesses in an effort to prove that the prosecutrix had made inconsistent statements in regard to what had occurred at the Prillaman home.

It was also shown in cross-examination of prosecutrix that she did not strike the accused, scratch him or kick him during the attack. The reason she gave for not doing any of the above mentioned things was that he held her hands; that she was trying to push him off of her; that she was scared.

This is not a case of admitted sexual intercourse and a reliance, as a defense, upon the consent of the prosecutrix. The case of the Commonwealth is based upon the evidence

to sustain a charge of forcible rape. The case of the accused rests upon his denial of the commission of the overt act.

[■] "In order to constitute the offense of rape, force must be used. It is a necessary ingredient of the crime, and that force must be such as may reasonably be supposed adequate to overcome the physical resistance of the woman upon whom the rape is charged to have been committed, taking into consideration the relative strength of the parties and other circumstances of the case, such as making outcries and giving alarm." *Mings* v. *Commonwealth*, 85 Va. 638, 8 S. E. 474.

The contention of counsel for the accused, that the evidence of the prosecutrix is inherently incredible, is fully answered in the written opinion of the learned trial court filed with the record. On this phase of the case we quote as follows:

"It seems clear to me that an analysis of the testimony introduced on behalf of the Commonwealth disclosed every essential elements of the crime as charged in the indictment. The accused admits his presence in the home of the prosecutrix on the night in question; he admits that the sex question was discussed and admits hugging and kissing the prosecutrix. He emphatically denies that he ravished or attempted to ravish her. On the other hand, the prosecutrix directly and positively testifies that the accused made amorous advances which she rejected; that he made an indecent proposal; that by use of his manifest superior strength, he threw her down on the lounge and then to the floor; that she threatened to scream and tried to scream; that he subdued her attempt to cry for assistance with threats and force; that he held her and through the application of force overpowered her physically and consummated the crime charged. She further testified that she rejected his advances; that she rebuffed his proposal and resisted him with all the strength she could muster, finally extricating herself from his physical embrace through a ruse with reference to opening a window. The testimony further shows that she ran from the house screaming and calling for assistance; that as she made the immediate outcry she was crying, and in a highly nervous state. Within the space of a few minutes thereafter, when the Prillamans arrived and a

police officer arrived at the scene, she stated that she had been ravished and named the accused. Her outcry and hysterical condition, abundantly established by competent proof, is a significant fact. A further fact seriously damaging to the accused is disclosed by the testimony of a disinterested witness to the effect that while the prosecutrix in her paroxysm of hysteria was making her first and immediate outcry, which named the defendant, a man was seen to run across the yard and jump over or off of the retaining wall in front of the Prillaman home. There is no testimony in the record directly identifying the accused as the person making his exit from the scene, yet in view of all of the surrounding facts and circumstances it was well within the province of the jury to adopt the theory of the Commonwealth that this fleeing individual was none other than the accused. It might also be pointed out here that an examination of the person of the prosecutrix on the night of the alleged crime disclosed a bruise or red whelp about the size of a man's hand on one of the legs of the prosecutrix above the knee."

The evidence clearly justifies the conviction and, unless prejudicial error has been otherwise committed, the judgment must be affirmed.

The second assignment of error challenges the action of the court in permitting the prosecutrix to testify that she was of previous chaste character and in refusing to permit the accused to rebut this evidence.

As heretofore observed, this is not a case where the accused relies upon the defense that the prosecutrix consented to the sexual act. If such were the case, the previous unchaste character of the prosecutrix could be shown by proof of general reputation that she was a prostitute. Since the accused has denied the charge that he was guilty of sexual intercourse with the prosecutrix, either with her consent or by force, the question of chastity is in no sense involved.

There is no merit in this assignment of error.

It is assigned as error that the court erred in giving and refusing certain instructions.

A careful examination of the instructions complained of clearly demonstrates that the jury was fairly and properly

instructed, and, in our opinion, it is unnecessary to enter upon a *seriatim* discussion of the instructions.

There are several other minor assignments of error which have been presented in the petition. They have been considered and found to be without merit.

The last major assignment of error relates to the refusal of the court to 'grant a new trial on the ground of after-discovered evidence. This after-discovered evidence relied upon is embodied in three affidavits. The first is the affidavit of the prosecutrix in which she repudiates her testimony given at the trial of the accused and deposes that she gave false testimony at the instance of Mrs. Prillaman. The second and third affidavits are those of one Raymond Sawyers. These affidavits were obtained several months after the rendition of the verdict.

■ That this assignment of error is without merit is, in our opinion, conclusively demonstrated in the opinion of the trial court which we adopt as a part of this opinion:

"The hearing of the motion to set aside the verdict of the jury on the ground of after-discovered evidence was ordered by the court to be and was held *ore tenus*.

"The oath was administered to the affiants and they were called as witnesses for the defense. The court allowed counsel for the defense to subject these witnesses to gruelling cross-examinations. Both the prosecutrix and Raymond Sawyers repudiated their affidavits.

"The prosecutrix reiterated and adhered to the testimony she had given at the trial. Raymond Sawyers stated that the material substance of his affidavits was false. He explained his presence at the Prillaman home on the night of October 29, 1939, and as to this he was corroborated by the prosecutrix through her testimony given on the trial of the accused and also by her testimony at this hearing . Sawyers was further corroborated by disinterested witnesses as to the time elapsing when he left a Texaco filling station, went to the Prillaman home for the purpose of obtaining his coat and returned to the filling station. Sawyer's testimony in repudiation of his affidavits is in substance to the effect that he knew absolutely nothing concerning the alleged offense. He stated that he was

present in the Prillaman home a few minutes and that when he left the accused was still there.

"In view of this unusual situation it becomes pertinent to inquire into the circumstances which surround the securing of these affidavits.

"The moving spirit behind these affidavits is W. T. Powell, the father of the accused. No father is to be censured for coming to the defense of his son when that son is enmeshed in the toils of the law, yet he must not allow his paternal zeal to lead him beyond the bounds of propriety.

"The record discloses that at the very outset of this prosecution, W. T. Powell has endeavored by fair means and foul to hamper and impede the operation of the processes of the law.

"Prior to the trial he visited the mother of this mountain girl at her home on Bent Mountain. He threatened, in the presence of the prosecutrix, to have her sent to the Reform School. He has operated on the malicious assumption that his son was being framed. His conduct, as disclosed by the record, with reference to intimidation, coercion and undue influence in his dealings with these simple-minded witnesses is reprehensible and contumacious. It would unduly prolong this opinion to enter upon a detailed discussion of this conduct. Suffice it to say that the record abundantly discloses conduct on his part that strikes at the very foundation of justice. He was the author of the letter dated January 22, 1940 (Exhibit 4), through which he procured a relative of his, living in North Carolina, to address an inflammatory letter to the trial judge in condemnation of the proscutrix. In this letter, he stated, 'By all means, do not mention in your letter that I have asked you to write this letter or have it written.' He was the author of another letter dated January 23, 1940 (Exhibit 7), which demonstrates his determination to resort to any means to besmirch the prosecutrix. He procured an itinerant peddler, who was allegedly an ex-preacher, to come from Shenandoah, Virginia, and go to the home of the prosecutrix on Bent Mountain and persuade her to change her testimony. The testimony of this peddler, one Otis Austin, convinces me, independent of the statement of any other witness, that this simple-minded child was coerced and

intimidated, through fraud, to repudiate her testimony. Super-added to this is the testimony of the prosecutrix herself, her mother and step-father, that Austin not only threatened but fabulously lied to her in his efforts to overpower her will and induce her to exonerate the accused. Austin's visit to the Bent Mountain home of the prosecutrix occurred on August 6, 1940. On the night of that same day, after Austin had communicated with his principal, W. T. Powell, he in company with Powell, the accused, and a notary public armed with a typewriter, returned to the Bent Mountain home of the prosecutrix. On this occasion, the affidavit was made. The record convinces me that on this occasion, both Powell and Austin applied the force of threats, intimidation and coercion.

"On August 9, 1940, Powell returned to the home of the prosecutrix with his next door neighbor, J. R. Meredith. His purpose was to have her reiterate the substance of the affidavit in the presence of Mr. Meredith.

"Before the hearing had been concluded on the motion after verdict, Powell again visited the home of the prosecutrix accompanied by Mr. Meredith. Meredith's testimony is most convincing that Powell on this occasion followed the method of approach used by Otis Austin. In this connection, Meredith testified:

" 'Mr. Powell had some correspondence with his relative down in North Carolina in regard to this case; one of them, I believe it was Mrs. Tom Dyer, and Mr. Powell wanted her people to read these letters to show just where those people stood and how they were trying to throw everything off on this little girl, and the letters were read aloud to Mr. Sheets and Bo-peep, and I heard them.'

"When it is borne in mind that the prosecutrix, her mother and step-father, testified that the *modus operandi* employed by Austin had for its purpose the convincing of the prosecutrix that the Court, the Commonwealth's Attorney, the jury and the Prillamans had all turned against her, and that it was necessary for her to change her statement in order to save herself from the Reform School, this statement, coming from Mr. Meredith, a neighbor and friend of W. T. Powell, lends

strong corroborative support to the contention of the Commonwealth that the affidavit of the prosecutrix is the fruition of fraud and undue influence on the part of the father of the accused.

"The facts and circumstances antedating and surrounding the taking of the affidavit of the prosecutrix give force and color to the testimony of Raymond Sawyers in explanation of the reasons which motivated him in making the two affidavits introduced as Exhibits 2 and 3 by the defense. Sawyers can neither read nor write. His appearance, conduct and demeanor speak loudly and pitifully that, mentally, he borders on the moronic. That he was promised money, a suit of clothes and harbored and kept in the home of W. T. Powell for weeks, admits of little, if any, doubt that Powell kept him under close surveillance and repeatedly discussed the matter with him. Not satisfied with the affidavit of February 21, 1940, Powell prepared and had him execute another, of substantially similar import, on April 16, 1940. In addition to this, he carried Sawyers into the presence of police officers and had him repeat his story. In this connection, a statement made by Officer Puckett, when produced as a witness for the defense, is significant. Puckett was asked if he thought Sawyers was telling the truth, when Powell brought Sawyers to him. Puckett stated, 'Well, I couldn't say that I did; I knew that there was one that he was trying to get away from—there was either something on that paper that he hadn't said or he was trying to get away from the question that I would ask him.'

"For the above reasons I cannot attach any credibility to these affidavits. In the first place they have been repudiated by the affiants and in the second place they were secured under circumstances which would not commend them to any court. In view of the related facts pertaining to these affidavits, as disclosed by this record, to allow them any weight on the theory that they even purport to disclose after-discovered evidence would be lending an air of dignity to a course of conduct which merits the express condemnation of any court.

"In arriving at this decision I wish to make it clear that

I am expressing no opinion as to whether or not W. T. Powell has suborned perjury.

"In *Holmes* v. *Commonwealth*, 156 Va. 963, Mr. Justice Hudgins quotes with approval from 20 R. C. L. 308, at page 969, where it is said:

" 'In view of the temptation to obtain a rehearing after an adverse verdict, particularly in a criminal case and in view also of the facility with which affidavits for this purpose can be obtained, all such evidence should be scrutinized with the greatest care and caution. It follows, therefore, that where affidavits and other proofs are produced for and against, which are conflicting and contradictory, and of somewhat even balance, so that it requires a precise estimate to determine as to the greatest weight or preponderance, the trial court's conclusions will not be disturbed, unless they result in manifest injustice.'

"In *Pauley* v. *Commonwealth*, 151 Va. 510, at page 518, Mr. Justice Holt said:

" 'Every man is entitled to one fair trial, and no man is entitled to more. It is for these reasons that motions for new trials, because of after-discovered evidence, are not looked upon with favor. If this were not true, then justice, sometimes none too swift, would be more leaden-footed than ever. *Metropolitan Life Ins. Co.* v. *Botto* (Va.), [153 Va. 468], 143 S. E. 625.' "

The judgment complained of is affirmed.

*Affirmed.*

HUDGINS and GREGORY, JJ., concurring.