# Richmond

ROBERT THOMAS BURNLEY V. COMMONWEALTH OF VIRGINIA.

December 4, 1967.

Record No. 6665.

Present, Eggleston, C.J., and Buchanan, Snead, l'Anson and Gordon, JJ.

*Richard H. Barrick* (*Wingfield, Barrick & St. John*, on brief), for plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

Robert Thomas Burnley, defendant, was tried in the Corporation Court of the City of Charlottesville on an indictment charging him with rape. The jury found him guilty of the offense and fixed his

punishment at confinement in the State penitentiary for a period of twenty years. On August 18, 1966, judgment was entered in accordance with the verdict. We granted Burnley a writ of error to that judgment.

In his assignments of error relied upon, defendant contends that the trial court erred (1) "in admitting the confessions, oral and written," given by him to police officers and the Commonwealth's attorney, and (2) in refusing to permit him to question the prosecutrix "either on cross-examination or when called as his own witness, as to her unchastity prior to the alleged offense."

The record discloses that the rape occurred about 3 a.m. on the morning of March 19, 1966. The prosecutrix was 20 years old, married, but separated from her husband. She was residing with her parents on Fifth street in Charlottesville at the time. After returning home from work on March 18, the prosecutrix decided to walk "down town". She arrived at "Cozy Kitchen" about 9:45 p.m. and drank a "couple of beers". Robert Walker, whom she had known for ten years, was there and the two went to "Monticello Lunch" and "drank a beer". Walker purchased some beer "to go" and at about midnight they proceeded to the playground at McGuffy School. While there Walker drank two beers and the prosecutrix consumed "about half of one". Because she would not have sexual relations with him Walker got mad and they parted company.

The prosecutrix then went to the "Waffle Shop". After eating a hamburger and drinking some coffee, she walked down Fifth street towards home. When the prosecutrix reached a point approximately in front of "Bell's store", she was "grabbed" from behind and "dragged" down an alley to the yard in the rear of the store by a then unknown assailant. She subsequently identified him as Burnley, the defendant, age 23, who was about six feet seven inches tall.

The prosecutrix testified:

"We were wrestling and everything else, and I was still screaming at the time. He kept threatening me. I was on the ground at the time and he was—my clothes, he was trying to take them off and I was still fighting with him. So finally he did get them off and he got on me and—sitting on my legs at first. Every time I'd get up, he'd knock me back down, knock my head against the ground. He tried to get his mouth over mine, and he did, he kept getting his mouth over mine so I couldn't scream. I was still fighting and trying to get him off of me, laying on the ground. He did get on me. He pulled my pants down, off my left leg."

The prosecutrix further testified that during the struggle she struck defendant on the head with a rock which she had picked up as they entered the yard; and that he was successful in penetrating her but he did not reach a climax.

After the attack, defendant instructed the victim to put on her clothes, which she did. He then led her out of the alley towards Fifth street. The prosecutrix had lost her eyeglasses during the struggle and she informed defendant of this fact. As they reached the entrance to the alley, a man was heard coming out of a house across the alley. The defendant at first "jumped", but when he recognized that it was Melvin Flannagan, he told Flannagan that "if he found any glasses to save them for him." The prosecutrix said that she was "scared" to say anything to Flannagan, because she thought "he might come and try the same thing Burnley'd done."

Following Flannagan's departure, the prosecutrix told defendant that she wanted her glasses. When he went down the alley to look for them she ran home, which was nearby. It was then about 4 a.m. The prosecutrix told her mother that she was late because "a boy was chasing me." She said that she did not tell her mother or the police of the attack because "I was scared to", and that she went to bed but was unable to sleep.

Around 12:00 noon on the same day, the prosecutrix told her sister-in-law of the attack. Following this disclosure, the prosecutrix's brother reported the incident to the police department. Police officers interrogated the prosecutrix and accompanied her to the scene of the crime. J. T. Camblos, Commonwealth's attorney, was informed of the attack because he had requested that he be "called in case of a serious felony." He went to the police station and discussed the matter with the prosecutrix. Late that night, March 19, she was taken to the University of Virginia Hospital, where she was examined by Dr. Arthur Garst, Jr. He observed "several abrasions and scratches on her left hip extending down the left leg to the knee" and also small scratches on her back.

As a result of this examination and of an investigation by the police, a warrant was issued charging Burnley with attempted rape. He was arrested around 3 a.m. on March 20, and brought to the Charlottesville police station. The Commonwealth's attorney was notified of Burnley's apprehension and proceeded immediately to the police station. Camblos testified:

"We took him into the detective room which is a little room just as you go into the court room there. I explained to him that

he didn't have to talk to us and that he had a right to have a lawyer. That he had a right to remain silent and didn't have to talk to us and that anything that he would say could be used against him. He appeared quite willing to talk. He said that he didn't have anything at all to hide. He said that he hadn't done anything. He was perfectly willing to talk with us because he hadn't done anything and that he didn't need a lawyer, and didn't want one."

The defendant, who had a knot on his head "about the size of a small hen egg", then stated that on the night before the alleged offense he had attended a dance with his mother and several other persons; that he left the dance at three or four o'clock the following morning with the same persons; that he went straight home and to bed, and that he wasn't on Fifth street and "could prove it."

Camblos and Lieutenant Morris proceeded to the home of defendant's mother and she corroborated defendant's statement with the exception "that they had come right up Fifth Street." An unsuccessful attempt was made to locate the other companions defendant named as having accompanied him to the dance. However, Melvin Flannagan was located and brought to the police station. In the presence of defendant he stated that he saw defendant with a girl on Fifth street about the time of the alleged rape, and that Burnley had inquired about lost eyeglasses. After Flannagan was "excused", Burnley stated to Camblos that Flannagan "was just lying on him because of bad blood between them"; and that they "had been fighting all last summer." According to Camblos, Flannagan later denied there was any bad blood between them.

Camblos told Burnley of the denial and asked him "why he didn't go on and tell the truth." Burnley insisted that he was not anywhere near the scene of the crime and Camblos left the room. He returned in a few minutes and after a brief conversation, Burnley said: " 'Can I call a lawyer?' I [Camblos] said, 'Yes, there is a telephone right there.' Either he or I—I am not sure which—I think it was he—said, 'It is right late in the morning—late at night to get a lawyer down here.' Words to that effect. If I said it; he agreed with me. If he said it; I agreed with him." Then, according to Camblos, Burnley remarked: " 'Well, I might as well go on and tell you about it.' "

Burnley admitted to Camblos that he did have intercourse with the prosecutrix, but that it was with her consent. Then he said that "she had not consented completely", but that on prior occasions he had gone to bed with the prosecutrix at her request.

Camblos testified that the total period of his interrogation was about an hour, and that there was "absolutely no doubt in his mind that he [Burnley] did understand everything that was going on."

At approximately 11 a.m. on March 20, Assistant Chief of Police C. O. Durham, after learning of the oral confession, informed Burnley of his rights and requested him to give a written statement because "[n]one of our memories are perfect". His oral confession to Durham of the rape was reduced to writing by Durham. It was then signed by Burnley in the presence of two witnesses.

On March 29, 1966, counsel was appointed to represent Burnley. A preliminary hearing was had on April 15, and the case was certified to the grand jury, which returned a true bill against defendant for the rape at its May term.

On May 19, the case was called, the indictment was read by the clerk, and defendant pleaded not guilty to the charge. The defendant had previously filed a motion to suppress the confession which was reduced to writing made by him to Officer Durham on the grounds that it was involuntarily made, and that it was obtained in violation of his right to counsel as provided by the Sixth Amendment to the Federal Constitution.

The court proceeded to hear evidence on the motion. After the Commonwealth had presented evidence in support of its contention that both the oral admission made to the Commonwealth's attorney and the written confession made to officer Durham were voluntary and admissible, counsel for defendant presented evidence of defendant's low mentality. The defendant did not testify at any time during his trial. Records and reports were introduced showing that defendant was committed to Petersburg Training School as mentally deficient on February 6, 1959, and that he was discharged on June 21, 1963 as improved. The final diagnosis was: "Mental retardation, moderate. Code 82, I.Q. 59"; and that he "functions very much like the twelve year old pre-adolescent."

In addition, Alexander L. Scott, principal of Jackson Burley High School, which defendant attended, testified that defendant had a poor scholastic record and stopped school on February 1, 1958; that an I.Q. test given him while a student indicated a score of 66; and that on the language portion he scored 87. He said that a person with an I.Q. of 66 is capable of understanding. However, he didn't think such a person "would be capable of a high degree of understanding with abstraction qualities but more with concrete —". He further

stated that as defendant grew older his grade would be lower, and that he did not consider the difference between an I.Q. of 59 and 66 of significance.

In overruling the motion to suppress, the trial court observed:

"The case seemed very clear to me. I was very much impressed with the testimony of the principal of the Burley High School, and the score was up and that 89 [87] was not considered to be too low when it comes to language and so forth.

"If this was a case where Mr. Camblos had browbeatened (sic) or in any way violated this defendant's rights, then, there might be a difference but it seems to me that the evidence is undenied."

The case was "continued until further order", and was concluded on August 18, 1966. On that day, defendant renewed his motion to supress the oral and written confessions, relying upon the decision of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.ed. 2d 694, which had been decided since the trial court's decision of May 19, overruling the motion to suppress. In addition, counsel for defendant, with the concurrence of the Commonwealth, had the defendant examined after the former ruling by Dr. Marvin D. White, a certified clinical psychologist; and the court was requested to permit him to testify.

Dr. White stated that he "administered a battery of tests including an intelligence test; a test for any brain damage; two brief personality tests." He found "no brain damage on the Bender test and no personality disturbance on the D.A.P. test." Dr. White testified that Burnley's I.Q. was 57, which "would fall somwhere within the lowest percentile of the population." He fixed defendant's mental age of nine years plus and thought that he was "highly suggestible." However, he assumed that most persons nine years old knew the difference between right and wrong.

The trial court observed that Burnley's trial had commenced on May 19, 1966, which was before the *Miranda* decision, and hence its mandates were not applicable. The court concluded: "I think that the whole question in this confession goes to the weight of it and not the admissibility, therefore, I am going to overrule the motion to suppress the confession. I think that the weight of it is strictly a question for the jury."

Following this ruling, the clerk read the indictment and defendant pleaded not guilty as was done on May 19, 1966. A jury was impaneled, and at the conclusion of all the evidence, which included

the oral and written confessions, returned a verdict of guilty on the charge of rape.

[1] The defendant, in his first assignment of error, claims that the trial court erred in admitting in evidence the confessions, oral and written, given by him to police officers and the Commonwealth's attorney. He argues that the confessions should not have been admitted because he was not warned prior to interrogation of his right to have counsel appointed if he could not afford one, and that he was incapable of knowingly and intelligently waiving such right prior to his confessions. Defendant relies upon *Miranda* v. *Arizona*, *supra*, which holds, *inter alia*, that evidence obtained from a person in custody as a result of interrogation cannot be used against him unless he was warned prior to interrogation "that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at p. 479, 86 S.Ct. at p. 1630, 16 L.ed. 2d at p. 726.

The defendant argues further that the procedural safeguards of *Miranda* are applicable to his case by virtue of *Johnson* v. *New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.ed. 2d 882. This case held that the procedural safeguards set forth in *Miranda* are applicable "only to persons whose trials had not begun as of June 13, 1966." 384 U.S. at p. 734, 86 S.Ct. at p. 1781, 16 L.ed. 2d at p. 893. It is defendant's contention that his trial began on August 18, 1966, and therefore *Miranda* is applicable. We do not agree. The record shows that on May 19, 1966, the defendant was arraigned and entered a plea of not guilty. The court then proceeded to hear evidence and argument on defendant's motion to suppress the confessions. After overruling the motion, the case was continued and the trial proceeded to a conclusion on August 18. It is true that on that date defendant was again arraigned and entered a plea of not guilty. However, it was unnecessary to repeat the arraignment of defendant or the entry of a plea. The arraignment and the plea on May 19 formed an issue to be tried. See *United States* v. *McKnight*, 112 Fed. Rep. 982.

This brings us to the question of what constitutes the beginning of a trial in a criminal case. In *Gilligan's Case*, 99 Va. 816, 827, 37 S.E. 962, 965 this court stated: "The trial of a criminal case begins with the arraignment of the prisoner, and ends with the sentence pronounced upon him by the court." Thus, when defendant was arraigned on May 19, 1966, his trial began, and *Miranda* is not applicable.

At the time defendant's trial began, the test for admissibility of a confession was whether or not it was voluntarily made. The trial court ruled under the evidence adduced that the confessions in question were voluntary and we cannot say, as a matter of law, that they were involuntary.

[2] The defendant also contends that the court erred in refusing to permit him to question the prosecutrix, "either on cross-examination or as his own witness, as to her unchastity prior to the alleged offense."

The Commonwealth presented no evidence as to the chastity or unchastity of the prosecutrix. On re-cross-examination of the prosecutrix, counsel for defendant attempted to interrogate her as to what sexual activities she had had with men other than her husband. The court sustained the objection of the Commonwealth on the ground that it was not a proper question on cross-examination. Later, defendant called the prosecutrix as his own witness. Counsel for defendant stated to the court, out of the presence of the jury, that he desired to ask her whether prior to March 19, 1966, she had had relations with men other than her husband. The court sustained the Commonwealth's objection to the question.

The defendant argues that this was proper evidence as consent was his only defense. He points out that Dr. White, his witness, testified that he [defendant] admitted having intercourse with the prosecutrix but that it was with her consent. Defendant cites 1 Wigmore, *Evidence*, § 200, p. 683 (3d ed. 1940) and cases from other jurisdictions for the proposition that particular acts of unchastity may be resorted to for the purpose of showing the probability of consent. Wigmore states that the better view is to admit such evidence, but "[n]o question of evidence has been more controverted."

The record does not show what the prosecutrix's answer would have been to the excluded question. Counsel did not vouch for the record, nor did he offer any evidence as to the prosecutrix's general reputation. Where consent is a defense to a charge of rape, the previous unchaste character of the prosecutrix may be shown by proof of general reputation. *Fry v. Commonwealth*, 163 Va. 1085, 1088, 177 S.E. 860, 862; *Powell v. Commonwealth*, 179 Va. 703, 709, 20 S.E. 2d 536, 538. General reputation cannot be established by the person himself under inquiry.

In *Fry v. Commonwealth*, 82 Va. 334, 336, it was said:

"The fourth exception is as to the refusal of the court to allow the

injured female to be asked if she had not been before a person of unchaste character. This question was properly excluded. The plaintiff [in error] would not have had the right to assault and ravish the said prosecutrix if such had been the case; and if it had been so, the plaintiff in error could have proved, if able to do so, by others, which he attempted to do."

If a prosecutrix, in a trial on an indictment for rape may not be cross-examined as to her previous unchaste character, reason and logic dictate that she may not be called as a witness for defendant to testify accordingly.

We hold that the trial court did not err in refusing to permit defendant to question the prosecutrix as to her unchastity prior to the alleged offense.

The judgment appealed from is

*Affirmed.*