## Staunton

WILLIAM PENN, JR. v. COMMONWEALTH OF VIRGINIA.

September 5, 1969.

Record No. 6968.

Present, All the Justices.

*Lawrence Douglas Wilder*, for plaintiff in error.

*W. Luke Witt, Assistant Attorney General (Robert Y. Button, Attorney General; Reno S. Harp, III, Assistant Attorney General*, on brief), for defendant in error.

Harrison, J., delivered the opinion of the court.

At a trial held April 10-11, 1967, the defendant, William Penn, Jr., was convicted by a jury of the first degree murder of Mozelle Leon Spencer and his punishment fixed at 20 years in the penitentiary. Judgment was entered on the jury's verdict and sentence accordingly imposed.

Defendant seeks a reversal of this judgment and a remand of the case for a new trial. While several errors are assigned, the critical issue is the action of the trial court in admitting into evidence a statement which defendant gave police officers on the 31st day of May, 1966. Defendant also questions the sufficiency of the evidence, and the action of the court in allowing a pistol found hidden in Penn's home to be introduced.

Mozelle Leon Spencer was murdered on April 9, 1966. He was employed as a night clerk at the Eggleston Motel, which is located at 604 N. Second Street in Richmond. His body was found on the second floor landing of the motel. The manager's office was disarranged, and blood stains were found leading from the office desk up the steps to the second floor, and on the landing where the body was lying. The owner of the motel testified that a change tray containing $72.36 was stolen from a money box used incident to the motel's operations.

Dr. David K. Weicking, a pathologist attached to Virginia's Chief Medical Examiner's Office, performed an autopsy on the body of the 78 year-old decedent. The doctor testified that Spencer died as the result of gun shot wounds in his right chest. He recovered a bullet from the body which he measured " . . . as approximately seven millimeters in width across it's face"; and he stated: "To my eye this resembles a twenty-two calibre bullet."

During the latter part of May, 1966, the Richmond Police Department had under investigation a series of murders, including the murder of one James Horace Carter, Sr. They had reason to believe that Carter was murdered with a small calibre weapon and that said weapon was in the possession of defendant, William Penn, Jr. Accordingly, a warrant was procured for a search of the premises of William Penn, Jr., described as a dwelling at 407 E. 15th Street, Apartment B., Richmond.

The police executed the search warrant on May 29, 1966, at which time they found and seized in the home of defendant one loaded H & R .22 calibre pistol and thirty-two .22 calibre bullets. The pistol

and bullets were found inside a washing machine filled with clothes and water. The bullets were concealed in a child's mitten.

At about the time the search warrant was being executed on May 29th, defendant was arrested on a warrant charging him with the murder of Carter. On the following day, May 30th—Memorial Day —there was apparently no activity in connection with the instant case.

On May 31st, Detective P. E. Hastings, of the Richmond Detective Bureau, went to Henrico County Courthouse. While there, and in the hallway outside the courtroom, this officer was informed by Detective R. E. Wright that Penn wanted to see him (Hastings). Hastings identified himself to defendant and said that Penn "told me that he would like to talk with me and tell me the truth about the whole matter and every way that he was involved in it". This witness said that he had not sought out defendant to discuss or question him about the crime, and that the request to see him came from Penn.

Hastings agreed to talk with defendant, and was furnished an office by the Henrico authorities for the purpose. There Penn, in the presence of Detective Wright, Captain Wilshire, Hastings and a stenographer, made an oral statement. This statement, as transcribed by the stenographer and presented to Penn, is as follows:

> "I, William Penn, Jr., colored male, 24 years of age, 407 East 15th Street Apt. B., have been advised of my rights to have an attorney before making any statement, that I do not have to make any statement; that any statement I might make can be used against me in criminal prosecution. I make this statement freely and voluntarily without any threats or promises from police officers, in connection with the death of Mozelle L. Spencer, Eggleston Hotel 604 N. 2nd Street.

> "That night I was supposed to meet a girl at Harrison Hotel. I ran into my brother, Thomas Penn, he said he was going to make some money that night. I had no idea he was going to rob the hotel. He went in there and when I went in he put the gun on him. I ran out. I begged him not to shoot but he did. I ran out and I ran up Second Street and got me a couple of drinks. He had the money tray with him and he took the money out and threw the tray away. He said he would give me part of it and don't talk and don't say anything. I don't know exactly the amount he gave me but I think it was $33.00 or something like that.

"Q. Were you and Thomas Penn together when you went into the hotel?

"A. No sir.

"Q. Where were you when he went into the hotel?

"A. I was just down the street and when I got in he had the gun on the man. Then I knowed what it was.

"Q. Where did he get the money from?

"A. The man gave him some money from his pockets. Then he made the man back up in the room.

"Q. After the man backed up into the room what did Thomas do?

"A. Thomas came around side. I wrestled with him tried to get the gun away from him. He pushed me back. I couldn't do anything with him so I ran out. That's when I heard the gun shot.

"Q. When you ran out of the place after hearing the shot when did you next see Thomas Penn?

"A. Right after the shooting.

"Q. Where did you see him?

"A. In the next block.

"Q. On Second Street?

"A. Yes.

"Q. What did he say to you at that time?

"A. I don't remember what he said.

"Q. What did he give you.

"A. He didn't give me anything. Later on he gave me some money and told me to keep my mouth shut.

"Q. Where were you then?

"A. In automobile I had rented to go to Lawrenceville.

"Q. Were you and Thomas in this Automobile when you went to the Eggleston Hotel.

"A. No, he was on Second Street from the start.

"Q. Where on Second Street did you first meet Thomas?

"A. Somewhere about Marshall and Leigh, no not Marshall, Clay and Leigh. I was coming out of a bootlegger's upstairs.

"Q. After Thomas had told you he was going to get some money, where did you see him go?

"A. He headed North on Second Street. I didn't have no idea where he was going. I thought he was kidding. He went in the Hotel and when I came in he had a gun on the man.

"Q. When did Thomas Penn give you the money that he stated came from the hotel?

"A. On South Side.

"Q. Exactly where were you then?

"A. At my house when he came on to my house.

"Q. He gave you this money at your house at 407 East 15th Street?

"A. He did and told me to keep my mouth shut and don't say nothing about what he did.

"Q. Do you recall the black tray?

"A. I don't know what color it was.

"Q. What did Thomas do with the tray?

"A. He throwed it in the river.

"Q. What river?

"A. The James River.

"Q. From a bridge?

"A. That's right.

"Q. What bridge?

"A. 14th Street Bridge.

"Q. After Thomas gave you part of the money at your home, did he have any comment to make concerning the shooting of the man in the hotel?

"A. He just gave me the money and told me to keep my mouth shut and don't tell anybody what he did.

"This statement was taken at 2:08 p.m. EDT May 31, 1966.

"I have read the foregoing statement consisting of three pages and I find it true and correct to the best of my knowledge."

Prior to permitting Penn to make the statement, Hastings testified defendant was advised:

"[T]hat he did not have to make any statement, that he was entitled to the services of an attorney before making any statement, that any statement he made could be used against him in criminal prosecution and, of course, no promises or anything from the Police were made at this time, and that he had the right to an attorney, like I stated, before making any statement, that he did not have to make any statement unless he so desired."

R. E. Wright, of the Richmond Police Department, testified that on May 31st, in the hallway of the Henrico County Court Building,

defendant asked him if he was Detective Hastings. Wright responded that he was not, that Detective Hastings was standing next to him. He said that Penn told Hastings "that he wanted to talk to him about the killings of some parties, people". Wright testified:

> "I advised him that—when we first went in there, that he did not have to make any statement, if he did make a statement it could be used in criminal prosecution against him, that he had a right to talk with a lawyer before making any statement."

The oral statement was made during the afternoon on May 31, 1966. It was transcribed by a stenographer, and on the following morning, about 9 A.M., defendant read the statement. According to Officer Hastings, defendant stated:

> "[B]efore he signed the statement on Mozelle Spencer, that he wanted to talk with a lawyer. I asked him if everything was like he said it in the statement and were they true. He said every word was true but he wanted to talk with a lawyer before he signed it."

Officer Wright testified that on the morning of June 1st, defendant admitted the "statement was true and that it was exactly the way it happened, but he would decline to sign it at this time until he had talked with an attorney". Following this exchange, defendant expressed a desire to see his wife, and she was permitted to talk with him.

Richmond Detective John W. Vann was shown defendant's transcribed statement on the morning of June 1st. Vann testified that after reading the statement:

> "I turned to William Penn and I told him who I was, I said it's my understanding that you gave the statement yesterday concerning the case of Mozelle Spencer at the Eggleston Motel, he said yes, that's right."

Vann further said:

> "A. I told him I had read the statement and I asked him his age and asked him if he could read and write and he stated that he could. So I asked him had he read the statement since it had been typed up, as I understood it wasn't typed as he gave it. He said he

could. He took the statement, he read it, and I asked him if it was any corrections that he wanted to make, he said no, this is what happened. Then I advised him of his rights and told him—

"Q. What did you advise him of?

"A. I advised him that, I said I understand you have already made the statement, I'm not asking you any other questions about it, you are entitled to a lawyer, and—to have a lawyer present, any statement you make can be used against you in Court, that's what I advised him of at that time.

"Q. Did you say anything about—I didn't understand you—did you say anything about he did not have to make any statement?

"A. Yes, I did.

"Q. All right, then subsequent to that, did you talk with him?

"A. He took the statement and then, of course, he read the statement, he had read it before, no corrections to be made, he said, that's when I told him, then, that a warrant had not been sworn out for him for this particular crime, but I told him one would be sworn out that day, I said whenever we leave here, you will be taken up to Police Headquarters in Richmond and the warrant will be sworn out for you charging you with this offense.

"Q. All right, and did you, when you took him back up to Police Headquarters in Richmond, did you get a warrant for him for this offense?

"A. Yes, I did, he stated at that time, and then I asked him I said, are you going to sign this statement, he said no, I want to talk with a lawyer before I sign it, he said, but this is what happened. He also stated that I would like to see my wife. So we told him what we would do, make arrangements for him to see his wife. We took him up to the Police Headquarters here, while he was talking with his wife I went to the Magistrate and swore out the warrant."

The entire transcript of the evidence, and all proceedings incident to the trial, were printed and constitute the record before us. The above mentioned are all the witnesses who testified. The defendant did not testify and introduced no evidence in his behalf.

■ As we said, the critical issue here is the admissibility of the statement made by defendant to the officers on May 31, 1966. A great deal of the record is devoted to a discussion of whether or not the rules enunciated in *Miranda* v. *State of Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966) applied to any interrogation of

defendant. This court has held that the trial of a criminal case begins with the arraignment of a prisoner. *Gilligan* v. *Commonwealth*, 99 Va. 816, 37 S. E. 962 (1901); *Burnley* v. *Commonwealth*, 208 Va. 356, 158 S. E. 2d 108 (1967); *Durham* v. *Commonwealth*, 208 Va. 415, 158 S. E. 2d 135 (1967); *Dailey* v. *Commonwealth*, 208 Va. 452, 158 S. E. 2d 731 (1968). While the statement of defendant was given on May 31, 1966, his arraignment was subsequent to June 13, 1966, and if the statement had not been volunteered, the *Miranda* warnings should have been given. *Johnson* v. *New Jersey*, 384 U. S. 719, 86 S. Ct. 1772 (1966).

Defendant was arrested on May 29, 1966 on a warrant charging him with the murder of James Horace Carter, Sr. On the same day defendant's home was searched by officers, executing a search warrant, and a pistol and bullets were recovered that had been secreted there.

So far as the record discloses, defendant was not questioned, and no statements were asked of him, or made by him, between the time of his arrest on May 29th and the morning of May 31st. It was then (May 31st) that defendant asked to see Detective Hastings of the Richmond Police Department, stating that he would like to talk with him, and to tell him the truth about the whole matter and every way that defendant was involved in it. Apparently Penn did not know Hastings except by name or reputation, and Hastings had to identify himself. It was Penn who initiated the conference with Hastings, and it was he who asked to talk with the detective, and to make a statement.

In *Miranda* v. *Arizona, supra,* the court, in dealing with volunteered statements, said:

> "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. *Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence.* The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or *a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth*

*Amendment and their admissibility is not affected by our holding today.*" (Emphasis supplied.) 384 U. S. 436, 478, 86 S. Ct. 1602, 1630.

There is nothing in the record to show or even to intimate that this statement of Penn was provoked, coerced or encouraged, or was in any way the result of any action by the police officers. It came prior to any interrogation or any questioning of defendant, and was given freely and voluntarily without any compelling influences. The police were under no duty whatsoever to stop defendant from making a statement, to refuse him the conference with Detective Hastings that he sought or to deny him the opportunity to talk with the detective and to tell the truth about "the whole matter" and "every way that he was involved in it".

At the time that Penn made his statement on May 31, 1966, *Miranda* had not been decided. It is observed that the warnings prescribed in *Escobedo* v. *State of Illinois*, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. 2d 977 (1964) were given. In fact it can be argued that the warnings given to defendant, after he indicated that he wanted to make a statement, were in sufficient detail, and were clear enough, to meet the standards prescribed by *Miranda*.

We do not interpret *Miranda* to mean that the precise language used by Mr. Chief Justice Warren in the opinion must be used by every police officer. The object of warnings is to inform a defendant of his constitutional right to remain silent, to be advised that any statement he makes may be used as evidence against him, and to be advised of his right to the presence of an attorney, either retained or appointed. Penn was specifically advised that he had the right to an attorney, and that he had the right to talk to a lawyer, before making any statement.

However, it is not necessary that we decide this question, for we hold from the evidence before us that the statement made by Penn was a "volunteered [statement] of [a] kind . . . not barred by the Fifth Amendment", and that its admissibility is not affected by the holding of *Miranda*.

The statement made by defendant was made in the presence of witnesses and taken down in writing by a stenographer and then transcribed by her. Thereafter it was acknowledged by the accused Penn to be correct when he read the transcription and had it read to him. Such a statement, made voluntarily, knowingly and intelligently,

is admissible in evidence even though it was never signed. See Annot. 23 A. L. R. 2d 919, 926; 29 Am. Jur. 2d, Evidence, § 533, p. 584; 23 C. J. S., Criminal Law, § 833, p. 237; *Wong Sun* v. *United States*, 371 U. S. 471, 83 S. Ct. 407, 9 L.ed.2d 441 (1963). The fact that defendant decided not to sign the statement, prior to consulting an attorney, did not affect its admissibility in evidence as a volunteered statement.

■ Defendant argues that even with the statement, the Commonwealth's evidence is not sufficient to establish his guilt beyond a reasonable doubt.

We have heretofore pointed out the discovery of a .22 calibre pistol and a quantity of bullets in defendant's home. Manifestly the secreting of the pistol and bullets in a loaded washing machine was for the purpose of concealing them.

The evidence also shows that the bullets recovered from the body of Mozelle Leon Spencer came from a small calibre gun which to the doctor's eye resembled a "twenty-two calibre bullet".

The officers testified as to the brutal murder of Spencer and robbery of the Eggleston Motel. Trails of blood were found in numerous places throughout the premises, and the body was found on a landing on the second floor, some distance away from the disarranged office of the motel where the money was taken.

The jury could have inferred from the condition of the premises that the murder and robbery were most likely committed by more than one person, and found from the doctor's testimony that a small calibre gun was used.

Defendant admitted that his brother advised him of the intended robbery in these words: "I ran into my brother, Thomas Penn, he said he was going to make some money that night", and further that he was present when "he [Thomas] put the gun on him [Spencer]". Defendant admitted that the motel was robbed, and that he shared in the fruits of the crime, receiving some $33 of the stolen money. Defendant stated that he was present when Spencer was forced at gunpoint to give a portion of the money, that part that he took from his pockets, to his brother, Thomas. Immediately after the crime, and within a block of the Eggleston Motel, defendant admitted "getting with" Thomas again, and driving him [Thomas] away from the scene of the crime. The two brothers then divided the proceeds of the robbery at defendant's home, and disposed of the money tray by throwing it into the James River from the 14th Street Bridge.

From the facts before them, and the admissions by defendant, the jury concluded that William Penn, Jr., together with his brother, Thomas, murdered and robbed Spencer. The verdict of the jury has the approval of the trial judge and is supported by the evidence.

Defendant also contends that without his oral statement, the evidence is not sufficient to sustain a conviction. It is unnecessary for us to consider this, for we hold that the statement was admissible, and that it was proper for the jury to have considered it in determining the facts in the case, and the guilt or innocence of defendant.

■ It having been established that the murderer of Spencer used a small calibre pistol, and such a calibre pistol having been found secreted in the home of defendant, the admission of the pistol in evidence under such circumstances and conditions does not constitute reversible error. *Flores* v. *State*, 372 S. W. 2d 687 (Texas 1963).

The judgment appealed from is

*Affirmed.*